Lisa Ann JACOBS, Plaintiff–Appellant,

v.

UNIVERSITY OF WISCONSIN HOSPI-
TAL & CLINICS AUTHORITY and
Minesh P. Mehta, Defendants–Appel-
lees.

Nos. 00–3528, 00–3978.

United States Court of Appeals,
Seventh Circuit.

Submitted June 14, 2001.*

Decided June 14, 2001.

* After an examination of the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* Fed. R.App. P. 34(a)(2).

Before BAUER, COFFEY, and WILLIAMS, Circuit Judges.

## ORDER

Lisa Ann Jacobs, a Caucasian medical resident, filed this suit under Title VII alleging that her employer, the University of Wisconsin Hospital & Clinics Authority (UWHCA), and a supervisor, Dr. Minesh Mehta, subjected her to sexual harassment and fired her because of her gender and race and in retaliation for her complaints about the harassment. The district court granted summary judgment to the defendants, holding that most of Jacobs's allegations could not be considered because they occurred more than 300 days before she filed her EEOC complaint, and that Jacobs could not establish a prima facie case or pretext. Jacobs appeals and we affirm. We have consolidated with this appeal Jacobs's challenge to the district court's award of costs to the defendants, which we also affirm.

Jacobs began her residency at the radiation oncology unit of UWHCA on July 1, 1998 and was assigned to work with Mehta for the first three months of her residency.

Jacobs soon experienced problems with her job performance. Jacobs's first evaluation, completed by Mehta on August 20, cited Jacobs for a lack of basic medical knowledge, inability to interpret MRI images, and poor communication and organizational skills. In follow-up evaluations on September 8 and 30, Mehta noted that despite small improvements in some areas, Jacobs' overall performance remained unsatisfactory.

In light of these problems, Mehta had Jacobs meet with the director of the residency program, Dr. Paul Harari. At a September 17 meeting, Jacobs acknowledged that she was having difficulty keeping up with her patient load, but blamed her problems on other staff members. After the meeting, Harari solicited input from other doctors on Jacobs's performance. One doctor responded that Jacobs's history-taking skills were "severely lacking" and that "her performance is at or below the level of a 3 rd year medical student." A second doctor informed Harari that Jacobs asked "odd" and "argumentative" questions at conferences and that other residents had raised concerns about Jacobs's interactions with patients. On October 1 Harari met with Jacobs again and informed her that he had serious concerns about her job performance.

In early October 1998 Harari discovered that Jacobs had provided false information on her residency application. First, Harari learned that Jacobs had been terminated from Boston University School of Medicine in 1993 for poor "behavioral academic performance." Jacobs stated in her application transmittal letter that she left the school because of financial pressures resulting from her father's death. On October 15 Harari learned that Jacobs had been terminated for "unacceptable performance" from her previous residency at the Roswell Cancer Institute in Buffalo, New York. But in her transmittal letter, filed after she knew she was to be fired from Roswell, Jacobs stated that she was looking to leave Roswell because the program was of poor quality.

On October 12 Harari, Mehta, and Karen Steiner, an administrative director, warned Jacobs that she might be fired for providing false information on her application. On October 15, after Harari learned of Jacobs's misrepresentation regarding her prior residency, the faculty of the radiation oncology unit voted 9–0 to recommend that Jacobs be terminated. Four days later, UWHCA's chief of staff, Dr. Jeffrey Grossman, wrote Jacobs and informed her that she was being terminated. As reasons for her termination, Grossman cited the "incomplete and misleading information" presented in Jacobs's application and her "severely deficient medical knowledge base, performance level and interpersonal skills."

Jacobs alleges that throughout her residency she was subjected to harassment and discrimination on the basis of her gender and race. According to Jacobs, Harari caressed her and inappropriately touched her arm, shoulders, and back during her interview and on four separate occasions during her residency. Jacobs also contends that Mehta made derogatory references to women by calling them "scatterbrained," "uneducated," or "incompetent," and told Jacobs that she was "not worth the effort of paging." Jacobs alleges that a radiologist on a few occasions told her that he wanted to "take a look" at her and then would stare at her breasts and buttocks. Jacobs also perceived harassment in sexual jokes that a female receptionist in the department e-mailed her and a physician's comment that Jacobs was his "guinea pig." Finally, Jacobs alleges generally that female residents were subjected to similar harassment and received less

pay and vacations than male residents. Jacobs claims (without documentary support) that she complained about this harassment to Harari and Mehta but her complaints led nowhere; in fact she claims that Mehta told her at their August 20 meeting that he would not tolerate complaints about harassment and that he would "kill" her if she pursued her complaints. The first complaint of discrimination in the record is an October 15 letter to the UWHCA's House Staff Committee for Medical Staff and the human resources office.

Ten months later, on August 15, 1999, Jacobs filed a charge of discrimination with the EEOC, alleging discrimination on the basis of gender and race, and retaliation. After that charge was dismissed, Jacobs filed this suit. The district court, noting that a plaintiff must file a complaint with the EEOC within 300 days of the alleged discriminatory behavior, held that only conduct which occurred after October 17, 1998, i.e., Jacobs's termination, could be considered. The district court then found that Jacobs could not establish a prima facie case of discrimination in light of her poor job performance and failure to provide accurate background information in her job application. Finally, the district court rejected Jacobs's retaliation claim because she could not demonstrate that the reasons given for her termination were pretextual.

■ On appeal, Jacobs first argues that the district court erred in refusing to consider her allegations of sexual harassment occurring outside the 300–day limitation period for filing an EEOC complaint. Jacobs invokes the continuing violation doctrine, arguing that she did not realize she had an actionable sexual harassment claim until her October 19 termination. Under the continuing violation doctrine, a plaintiff may include acts of harassment that occurred outside the limitations period where such acts are part of a pattern of harassment that continues into the limitations period. *See Filipovic v. K & R Exp. Sys., Inc.*, 176 F.3d 390, 396 (7th Cir.1999); *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir.1999). The doctrine applies, however, only where it would be unreasonable to expect the plaintiff to sue before the limitations period expires, as in a case in which the discrimination is recognizable as actionable only in light of activity that occurred within the limitations period. *See Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1167 (7th Cir.1996).

■ We reject Jacobs's contention that the continuing violation doctrine applies because no event occurred within the limitations period that would have made her realize that she was being sexually harassed. *See, e.g., DeClue v. Central Ill. Light Co.*, 223 F.3d 434, 436 (7th Cir.2000). Every incident of harassment alleged by Jacobs happened before October 17, 1998; the only event that occurred after that date was her termination. Even if her termination is evidence of discrimination (which it is not), it is not an act of sexual harassment and it would not make one realize that past harassment was actionable. Therefore, the district court properly refused to consider Jacobs's allegations of harassment occurring before October 17, 1998.

■ Jacobs next challenges the district court's ruling that her race and gender discrimination claims fail because she could not establish that she was meeting UWHCA's legitimate expectations. In support, Jacobs relies on a letter of recommendation that she received one month after her termination from J. Martin Johnston, a UWHCA doctor. She also point out that the record does not contain any evidence that she was placed on probation

or had medical malpractice claims against her, or any evaluations from female doctors. Furthermore, Jacobs insists that she provided truthful information on her application because she was asked only which schools she had attended and what residencies she had worked for, not the reasons why she left those schools or residencies.

Jacobs's arguments are unavailing. Mehta's and Harari's evaluations of Jacobs established that she was not meeting UWHCA's expectations and, aside from an unsupported allegation that those evaluations were fabricated, Jacobs has provided no evidence to challenge those evaluations. *See Hong v. Children's Memorial Hosp.,* 993 F.3d 1257, 1262–64 (7th Cir.1993). The letter from Johnston is largely irrelevant; Johnston worked in a different department of the hospital and acknowledged that he had no insight on her termination. The lack of evaluations from female doctors is also irrelevant given that it is mere speculation what such evaluations would say. *See, e.g., Robin v. Espo Engineering Corp.,* 200 F.3d 1081, 1091 (7th Cir.2000) (mere "metaphysical possibility" is not enough to create a material issue of fact); *Hong,* 993 F.2d at 1264 (in order to survive summary judgment, plaintiff must do more than simply show "some metaphysical doubt about the material facts"). Jacobs's argument regarding prior schools and residencies is misleading at best. Although Jacobs did not provide any false information on her formal application about why she left Boston University and the Roswell residency, her transmittal letter accompanying that application aimed to mislead or misrepresent. Furthermore, she acknowledges she did not respond honestly at her job interview to questions about leaving. In light of the poor performance evaluations and misrepresentations in her application, Jacobs failed to meet UWHCA's legitimate expectations. Because she can-

not establish a prima facie case of discrimination, we need not address Jacobs's pretext argument. *See Robin,* 200 F.3d at 1092; *Foster v. Arthur Andersen, LLP,* 168 F.3d 1029, 1036 (7th Cir.1999); *Coco v. Elmwood Care, Inc.,* 128 F.3d 1177, 1178–79 (7th Cir.1997).

■ Finally, Jacobs challenges the district court's decision to award $8,693.86 in costs to UHWCA and $4,360.27 in costs to Mehta. Jacobs argues that the district court erred in awarding costs for both her videotaped deposition and transcripts of the same deposition. She correctly notes that *Barber v. Ruth,* 7 F.3d 636, 645 (7th Cir.1993), and *Commercial Credit Equipment Corp. v. Stamps,* 920 F.2d 1361, 1369 (7th Cir.1990), disallow the taxing of costs for both videotaping and transcribing a deposition. *Barber* and *Commercial Credit,* however, both rely on language in a pre-amended version of Federal Rule of Civil Procedure 30(b)(4) stating that "a party may arrange to have a stenographic transcription made at the party's own expense." A 1993 amendment to Rule 30 eliminated the phrase "at the party's own expense," and therefore the district court did not err in taxing both costs to Jacobs. *See Tilton v. Capital Cities/ABC, Inc.,* 115 F.3d 1471, 1478–79 (10th Cir.1997); *Morrison v. Reichhold Chemicals, Inc.,* 97 F.3d 460, 464–65 (11th Cir.1996).

■ Finally, we have taken with the case Jacobs's motion to reduce the costs awarded to $1 due to Jacobs's purported indigency. Indigency is not necessarily a bar to an award of costs, *see McGill v. Faulkner,* 18 F.3d 456 (7th Cir.1994), but even if it were we would deny Jacobs's motion because she is not indigent. While Jacobs is unemployed, she lives in her mother's $475,000 house, has a second house in New Hampshire, and receives

$2,473 stipend from her mother every month.

For the foregoing reasons we AFFIRM the grant of summary judgment and the award of costs to the defendants. Jacobs's motion to reduce the costs awarded is DENIED.